My name is Michael Garth Moore. Good morning. It's my privilege to be in this magnificent seat of justice to speak for my client Kathleen Huggins. As I was preparing, and I'd like to reserve two minutes, Your Honor, for rebuttal. As I was preparing to come here, I made a comment to my wife that I had an uphill battle here. And she, not being a lawyer but an artist, said, Why? And I said, Well, if you look at the statistics, 85% of all discrimination plaintiffs never see the inside of a courtroom with a jury because summary judgment is granted against them and upheld by the Court of Appeals. More than 8 in 10. And when I said that to her, she said, Well, how long has this law been in effect? And I said, 50 years. And not being a lawyer, she said to me, Well, that tells me two things. And I asked, What was it? And she said, Number one, either there simply is very little discrimination going on in this country. It has been eradicated by the enforcement, or there's something wrong with the enforcement of this law. That cases are being broomed out of courts on summary judgment. That should not be. This is one of those cases. Because I went back to this court's holdings, and I found, for example, Where did you get that 85%? Sorry, Your Honor? Where did you get that 85%? That doesn't sound right. Because, number one, there's cases that go forward that we never see, that people don't appeal. Absolutely. And then I'm not at all sure that in the Ninth Circuit that 85% of summary judgments are affirmed. That may be true because those I think it's more like 60%. Those statistics did not break out by But anyway, we're case by case. Understood. So let's look at your case. One of the things I want to ask you, now, your client was how old when she got hired? Like about 61, something like that? Yes. And she also got a significant promotion after she was hired. And then she didn't get the job that we're talking about here, right? And then after that, she left about a year later. That's correct. So she wasn't fired on that. She left. But why shouldn't we apply the same actor inference here? Because your client got the same person that did not give her the job that you're questioning, gave her a promotion, which was like a 30% promotion in salary shortly before. Interesting question because it does bring up same actor inference. It's an inference, not a rule. And in this case, Your Honor, what we know is that Kathleen Huggins was working in 2015 for the company that was headed by a different individual than Riddle. Martin was his name. And by that time, she was already performing the VPHR functions because it was already understood that Ann Guernsey, who was the titular head of VPHR, was incompetent. So my client was already performing these duties. When Riddle came on, he learned that my client had gotten an offer from another corporation and was thinking of leaving. And because they were desperate to have a VPHR functionary without getting rid of Guernsey, she got the promotion. So what she got a promotion for was to actually do the work, getting paid for some of the work that she was already doing. But what you've just recounted doesn't seem accurate with respect to the record. The record indicates that your client was hired. She was working for Ms. Guernsey. Your client was offered another job. Ms. Guernsey learned of that and went to Mr. Riddle and said, I don't want to lose her, let's keep her on board. Mr. Riddle agreed to the promotion. And then Mr. Riddle hired an outside agency to evaluate the effectiveness of his management team. And that agency then decided that Ms. Guernsey should not remain in her position. So this all happened after Mr. Riddle had already given the promotion to Ms. Huggins. Actually, the testimony from Ms. Huggins is it was known before Riddle came that Ann Guernsey was, in fact, not capable because she was handling VPHR functions in 2014, long before Riddle came. But in any event, so Mr. Riddle, if that's correct, would not have known that. But Ms. Guernsey went to Mr. Riddle and asked that Ms. Huggins be given the promotion, and he agreed. He gave her the promotion. So why doesn't that raise the same actor inference that you have to overcome to show that he has some discriminatory animus if he's already promoted a person, a woman who was 61 years old? The evidence supports for a jury to determine whether that was done to cover for a period of time until he was able to find someone, a male, who could handle that position. So it's not an issue of determination here. And, in fact, the court below didn't address the same actor inference. But she didn't get removed from the position that she got promoted to. No, she didn't. She continued to do that work. And he gave her that promotion. And as Riddle testified, all during the weeks and months leading up to his choice of Arkells as the VP, he was, quote, unquote, interviewing her for the same job. The position that she was in, the position she held, was not the position of Vice President of HR, even though all the evidence was that she was actually doing that job. So she was simply a fill-in for Riddle until he could locate someone who he felt more comfortable with. But he didn't take her out of that position, and she got a 30% raise. Absolutely. But we're not talking about whether or not that particular promotion kept Riddle's discriminatory animus from promoting her to the VPHR position. Well, but that's the whole thing with the same actor inference. If he hadn't promoted her once within, then you have a stronger argument on the second one. I mean, I don't know. I'm going to ask them whether they're arguing that. But let's assume that you get over to pretext. And, I mean, there's a couple of things in terms of that it's not a classic application for a job. What she sent was, well, I know I'm probably not the best person for the job or whatever, and sort of floats out this thing. But, you know, here, maybe this, that, or the other. So it's not clear to me that she applied for the job. But apparently, I'm going to ask them on the other side, in exhausting the administrative remedies, that I'm not sure whether they didn't concede that she applied as far as that goes. But what's your evidence of pretext? You refer to Huggins' experience leading a Japanese church congregation and working at a Japanese company, but these positions were not listed on her resume. So why should we consider them in assessing whether Walbro's position that Huggins was unqualified was pretextual? They were not listed on her resume because she never received the Monster.com listing of the job duties and key responsibilities, which she would have, and which she so has done, Your Honors, in this case, in Exhibit 28, which is attached to her declaration, in which her experience shows she was equal or superior to the man that was hired, Arkels. Arkels was not fluent in Japanese. Arkels could not write Japanese. Did she say she was equal or superior in her deposition, or did she say, I'm not better, but I'm not worse? What did she say? She said that she did not make that determination as to whether she was better or worse. In her declaration, she listed them side by side. And as you can see, her declaration shows that she was at least as qualified as Riddle. In fact, a jury, I think, could find more qualified. But she acknowledges that the critical issue for Walbro was they wanted, and Mr. Riddle wanted a person that's the vice president of HR who had experience influencing a Japanese board of directors experience. It was phrased a different way as well, essentially. C-level people. Directing and working with management level and a Japanese organization. There's nothing in that that said the person had to have lived in Japan or speak Japanese fluently. She'd actually worked for two Japanese corporations. But she didn't have this experience, and she conceded that she didn't have the experience of working with the board or influencing Japanese management or Japanese board of directors. She worked for a church group, and then she worked at a food company, none of which was on her resume. And how does that stack up against Arkell's years of experience at management level? She had the same years of experience at management level, and as I said, if the goal was to be able to integrate a new CEO into Japanese culture and business culture, she was superior to him. Riddle had not been involved in that for 13 years. She actually had a fluent knowledge of Japanese and integral knowledge of the business culture in Japan. But let me move on, if I might, because I understand your questions, and I'm running out of time here. You were asking about pretext. Pretext. Well, this court is held in pain. The question of pretext is the one for the jury, because for one who tells the truth need not recite different versions of the same event. And we have substantially different versions of the same event from the EEOC position statement to Riddle's testimony in his deposition, which I call Riddle 1, and then Riddle's subsequent in the reply declaration that he filed. We actually have substantial differences here. If you look at the position statement itself, again, the company said Riddle's first choice to fill the position was a woman, Kay, with whom he had worked, so on and so forth. Riddle testified that he had not worked with this woman that he says he contacted, who was Yana, and he did not bring her to Enloe, that he just spoke to her. Now, there's a question of credibility. The trial court said, well, I was intrigued by this language. Talking about the EEOC position statement, the language is not factually true, but substantially accurate. Not factually true, but substantially accurate. So it could be a lie, but it was substantially accurate. In fact, it's not substantially accurate. And if it is, your honors, this is quintessentially a question of credibility for the jury. What evidence did you proffer that she, in fact, had experience influencing a Japanese board of directors of a for-profit corporation? When you talk about experiencing the board of directors, I don't believe there is. I mean, for-profit corporation. Right. She worked for Japanese corporations. What evidence did you proffer of her experience in that area? Nothing. Thank you. Nothing. Now, the key here, though, when we talk about her experience, is what was it that motivated Riddle not to give her the job? And this is where the EEOC position statement comes into being, because Riddle testified when he was asked if she was qualified for the job, if she considered for the job, he said he was interviewing her for the job for weeks and months. Weeks and months he was interviewing for her, and it was only her e-mail in which she said, I don't want the job, that made him stop considering her. Well, obviously she was qualified for the job, or Riddle wouldn't have been considering her for a job when she was actually doing the BPHR job. So I'm about to see my time is about over here. Well, if you want to retain that, then you can hear what they have to say and respond. I'll be happy to come back. Thank you. Okay, thank you. Good morning, Your Honor. Steven Sasanti on behalf of the appellant, Walbro. Good morning. I'd like to ask you the very same question I asked your colleague in opposition. What evidence is there that your client had experience with for-profit corporation board of directors? Meaning the individual who was selected for the position? Yes. Mr. Arkells? Yes. Yeah, Mr. Arkells, yes. I have in the appeal response, we submitted on page 1617 Mr. Arkell's experience, and I don't know it chapter and verse, but reading from what we submitted, Mr. Arkells had indicated on his resume that he had worked as the manager of human resources for Nippon Airways for 12 years advising, this is quote, advising Japanese executives and board members on HR build-out, dot, dot, dot, dot.  It's virtually identical to the experience of this lady. Is that not correct? No, Your Honor. Not even close. And this is no slight on Ms. Huggins, but she's pretty much been a career compensation and benefits HR person. That's what she was hired into. And I think this has kind of gotten lost a little bit from, in this case, not on the district court judge, I guess, but she was hired in as a compensation and benefits person, and shortly after Mr. Riddle became the CEO, as the panel has noticed, he promoted her into a role. And then the person she reported to by virtue of the recommendation from an outside consultant says, I think you need a more experienced person. So Ms. Guernsey gets removed. And now Ms. Huggins wants another promotion into her boss's role a few months later when all the while she's pretty much been a compensation and benefits person. Well, okay. I think that Mr. Riddle is a little problematic in the sense, and maybe he's a little problematic in that he doesn't like, he's not as direct as he should be with people because he, you know, maybe he was trying to be nice to her rather than just saying, I'm sorry, you don't qualify for X, Y, and Z and make the end of the story. He says sort of equivocal things. And then Ms. Huggins doesn't help things by, you know, I wouldn't consider it to be an application if someone sends this e-mail like, well, there's no harm in asking, but I'm really probably not the most qualified, but X, Y, and Z, and you sort of float the balloon out and without actually putting yourself out there, then see how someone responds. Well, he didn't exactly bite, but he didn't exactly say no until later. So you have all this ambiguity. And then you argue in your brief that there's no evidence that she was denied the position, that she never applied. But I look at your position statement that you filed with Arizona, and it asserts, quote, it is undisputed that Huggins was denied the promotion. So how do I square that? Well, Your Honor. That sort of implicitly encompasses that she applied. Admittedly, that's problematic, admittedly, but it's not. Yeah, it's like kind of throwing a dagger in your foot. It's problematic, but it's not dispositive of anything, and this is why. Number one, in order to determine whether she was denied, she has to meet the standard that was enunciated by the Supreme Court in 1978 in FERNCO, which said that an applicant has to do everything in her power to apply for employment. So if she can't establish that she applied for the job, we don't even get to the part of the denial, which I acknowledge that. But you say it's undisputed that she was denied the promotion. I understand that's what's in the position statement, Your Honor, which was drafted by one of my former colleagues, and I guess I have to admit. Your secretary did it? No, I won't get into that, Your Honor. It's someone who's no longer with the firm. But in any event, if she didn't apply, she couldn't be denied, whether he was considering her surreptitiously or whether he was considering her directly. From a prima facie case perspective, I think the first issue is did she meet that burden or not? You read that e-mail. It sounds, from the materials that we have before us, as if she was being considered as if she had applied. I agree totally with Judge Callahan. It was a pretty mealy-mouthed application. But it seemed that you were, in fact, considering her as an applicant. I don't think there's any doubt based on Mr. Riddle's testimony that he was considering her. But I kind of liken it to, I think this happens in corporations all the time, there's a position that's going to come up and the company takes stock of who it has in its ranks and whether any of those people are capable of filling that role. Does that mean that if I determine that none of those people are capable, in my opinion, of filling that role, that I've denied them a job when the Supreme Court standard says that you have to do everything in your power to at least seek it out? I think that's the issue. He was considering whether or not she was someone who could do the job. He ultimately concluded that she couldn't. Does that mean that she was denied the job in the legal sense? I think that's it. It's kind of a granular argument. When he told her, then he told her, well, we're looking outside the company at that point, right? After he had determined that, look, I don't think that she has what it takes. Did he tell her, I think you're more tactical than strategic? I think the testimony on what he told her was pretty simply what you had indicated before. We're looking outside the company. Yeah. Now, could she have filled out an application, a formal application, or was it advertised in a way that no one could fill out a formal application? It wasn't a job where I don't believe there was an application within Walbro that she could have grabbed and filled out, but she certainly could have made it known that I really want to be considered for this job. I think I'm capable of doing it. And she said everything she said was the opposite of that. And these are all fair questions, but I think at the end of the day they all, and this is where I think plaintiff's brief focuses almost entirely, is on the prima facie case. Well, okay, so if we put her past, since you both have given varying explanations of that, let's say maybe there is a tribal issue as to whether she applied. Okay. Then you get to what your business explanation is for why she didn't get it. Right. And you give one, and then she gets to go to pretext. Correct. So if at pretext, what is the evidence of pretext? Well, there is none, and that's where the crux of the case is. And what's important is counsel has cited that the Ninth Circuit has, the Ninth Circuit has. Well, she says she, he, counsel for Ms. Huggins is saying that because Mr. Riddle gives inconsistent statements that that, and there is, there is case law out there that says that circumstantial evidence can come together for pretext. Right. The inconsistencies in the context of employment discrimination cases have to focus on different reasons for the explanation for the decision at issue. He has not offered varying explanations for why she didn't get the job. The testimony and the issues that counsel is trying to bring forth to create a question of fact relate to the nature of the person who he contacted. In the position statement that was submitted to the EEOC, it was, it was stated that it was K. In fact, as the case went on and, and more rocks were unturned, it was discovered that no, it wasn't K. K. was a female amongst many, by the way, who the recruiting search firm had identified as a potential candidate, and she eventually took her name out of the hat, as did one of the other females. Yanna, who is one of Mr. Riddle's former colleagues, is the person that he reached out to. The point of all that is to simply indicate, it's a tangential fact to further demonstrate that Mr. Riddle has no animus against females or, quote, unquote, older employees. He said something to her like, we're looking not for people outside the company, but we're looking for women outside the company. Is that right? No, Riddle said we're looking for, I believe the testimony is we're looking for a certain type of person outside of the, outside of the company. But you didn't identify that person by gender? I think there are two, one is the statement he made to the plaintiff during the conversation that was mentioned earlier. And then the other one is, who did Mr. Riddle reach out to, if anyone, about this job? And he reached out to a female. That's the only thing. No, but I'm talking about the conversation, the first conversation. No, he did not specifically reference any gender in that conversation. He just said we're, basically he said we're looking for someone who has different qualifications. Well, okay. You don't really emphasize very much the same actor inference. Is there a reason for that? No. I think the district court astutely pointed out that Mr. Riddle is the same person who promoted her. So the inference is common sense. If I treat you favorably, knowing your protected characteristics, it's very unlikely I'm going to turn around and treat you unfavorably based on the same exact protected characteristics. And the district court judge astutely pointed out we didn't say same actor inference when we argued at the lower court, but we made the point Riddle promoted her months before he filled the VPHR position, knowing she was female, or is female, and knowing that she was her approximate age. Why would he then disqualify her for discriminatory reasons because she's female and of a certain age? That doesn't make any sense. Well, there's a couple other random facts, and I'm wondering if they matter at all. In Ms. Huggins, is Ann Guernsey, I guess her name is? Correct. Was kind of her advocate initially to get the promotion. Right. And that Ms. Huggins in her deposition throws Ann under the bus. She does. And says, well, everyone knew she was incompetent, or this, that, and the other. So does that mean anything? And then also somewhere it comes up that Ms. Huggins had a prior discrimination suit at her prior employer? I'll start with you. The fact, I don't think either of these are relevant to the issues before the court. The fact that other than plaintiff substantiates the view of the outside consultant, that Ms. Guernsey's not the appropriate person for the position and we need to find someone new. But then Mr. Riddle seems to not be a guy that likes to be a tough HR guy, so then he finds another place for Ms. Guernsey, right? She had a dual role in HR and compliance, so he kept her in her compliance position. Well, he seems to like to let everyone down easily rather than just tell them directly they're not qualified for something, or directly what, and then is. Well, no, I mean, Ms. Guernsey continued on in that role. I think the consultant had recommended that they entirely part ways with her, and he said, no, I think she can have value. So whether or not he could have handled it more directly or not, it's not evidence of discrimination. What I think is interesting in this case, though, if you think about it, is Ms. Guernsey's identified by the outside consultant as not being the appropriate person for the BP of HR job because she doesn't have the skill set, and then here this morning we hear that plaintiff should have gotten the job because she was effectively performing Ann Guernsey's job. That's the very job that the outside consultant said is not the appropriate job that you need going forward. So the fact that she allegedly, and this is pure, I mean, it's really taking the evidence and stretching it out that she was performing Ann Guernsey's job. That's really her view. There's no real record evidence to support that. But even if it's true, she was performing a job that was not the job that was needed for the company going forward. So because you're not going to get a chance to sit up, you don't get the last word. Correct. Okay. And counsel for Ms. Huggins is going to get up and is going to say what her best argument for pretext is. Tell me what her best argument is and why it's not good enough. Your Honor, I'm not. If you say he's not going to make one, you're not going to. Well, he will, and I'm not being flippant when I say this. There is no evidence of pretext, none. There is literally not. What's he going to say his evidence is? Well, he's trying to create mountains out of molehills based on alleged inconsistencies with who Riddle contacted. Was it this female or was it that female? And he's trying to create alleged inconsistencies by the fact that he deemed her not qualified, but he stopped considering her when she said she didn't want the job. As the district court pointed out, those are both consistent. I've come to the conclusion that you're not qualified and you're telling me you don't want the job. Oh, great. Now I don't have to think about you anymore. That's essentially where the district court ended up. It's like, okay, you let me off the hook. That's the best case of that evidence. I mean, that's her best argument. The bottom line is there's not a single, there's no evidence of a single comment that would demonstrate that Mr. Riddle had any animus towards women or quote-unquote older employees. He promoted her when she was 61. A few months later, there's this other job open. There is a substantial search that includes females, quote-unquote older employees or candidates. There's not a single piece of evidence that a single candidate was excluded based on any protected characteristic. Females were included, older employees were included, and the three people who were ultimately at the end for consideration. Huggins admits every single one of them had the qualifications that were on paper for the job and that not one of them was she more qualified than. I think she says, though, I think what counsel is saying is because she sort of got nipped in the bud here or got that whatever occurred, her resume wasn't tailored to show that she had that experience that could have put her in the running. What's your answer to that? Well, two, number one, and I think Judge Lucero pointed out this earlier, the experience that she's claiming made her qualified for the job had nothing to do with advising C-level. She ran a congregation in Japan so far long ago that it wasn't even on the resume that she attached to her email. That's how insignificant the experience was. But the district court noted correctly that whatever experience she had or didn't have, the only thing that the court can consider, kind of going back to the hearing that we just had before this, is what was in front of Mr. Riddle? Like what was in front of the administrative law judge in the prior hearing? She can't embellish her experience and credentials after the fact through the litigation. The issue is what did Riddle know or didn't know? He had no idea about any of this alleged experience, which, again, was running a Japanese congregation in Japan some 20 or 25 years earlier. There's not a single piece of evidence suggesting that that experience translated into any type of business acumen. Okay. I took you over time because I asked the question, and so you properly answered it. I have one more question. Yes. My colleagues have. She knew of that experience, and when she testified in her deposition that she was not more qualified than the other candidates, we could assume she was including all of her experience in Japan that she didn't include on her resume? Is that accurate? Your Honor, I would assume because when I took her deposition, I presented her with the qualifications as the three finalists had presented them to Enloe, the search firm, and here they are. Would you agree that they are qualified? Yes, I would. Would you agree that you're not more qualified or they're more qualified than you? She said, I would agree that they are qualified and that I am not more qualified than them. So I assume that took into consideration her own credentials, and I don't want to take any more time. But that presupposes that it couldn't be equally qualified. In her mind, she considers herself at least equally qualified, but it's very clear from this circuit and, in fact, an opinion judge that you had authored in the Tenth Circuit, you can't just say I'm equally qualified, therefore discrimination. The test in this circuit is you can establish pretext by showing that you have superior or vastly greater qualifications, but to say that a jury gets to decide whether two equally qualified candidates, that's a basis for pretext. No, that's questioning the business judgment of the employer, which is another hallmark in this court, which is that the courts are not allowed to second-guess decisions that on their face don't appear to be discriminatory. So at best, you have two or four, if you include the other three candidates, you have four equally qualified candidates. Walbro selected the candidate that it believed was the most qualified, and plaintiff can't dispute that he met the minimum qualifications and that he was minimally qualified for the job. And there's not a single indicia in the record that the search that led to those candidates was tainted with any type of discriminatory animus at all. So when I say I don't think there's any evidence of pretext, I genuinely believe there is none. I think the only really philosophical argument is probably on the prima facie case. Okay. Thank you. Thank you very much. All right. I'll give you three minutes. Thank you, Your Honor, for your time. One thing I would like to say, because this hit me early in the argument, your reference to the same-actor inference, I've done this kind of law a long time, and the only application of the same-actor inference in any case that I'm aware of is where the individual hires this person into that position and then later terminates that individual from that position. I've never heard the same-actor inference applied to somebody promoting to a lower position and then denying a higher position to that individual. But I will, again, that's an inference. That's for consideration by the fact finder in any event. What about, I may be mispronouncing the case name, but it's Schechner versus KPIX TV, 9th Circuit, 2012. The same-actor inference applies to favorable employment actions other than hiring, such as promotions. Then you have me. I missed the case. In any event, in any event, we're talking about same-actor inference, and we talk about inference. We're talking about weighing credibility. We're talking about making a decision as the fact finder. The question is whether or not the explanation given by Mr. Riddle and by Walbro was not worthy of belief. That's the issue. But it is even more framed by this, not that it's not worthy of belief, but can a jury find it's not worthy of belief? Who has the burden on pretext? The plaintiff has the burden. Okay. And it's a burden of what, persuasion? Preponderance of the evidence. Preponderance of the evidence. And the burden is persuasion. But as you see here, and I'm going to be done here shortly, as you see here there is much more here than simply the statement of, well, Mr. Sassante is a super good lawyer, great lawyer. And as he stood up here he said, well, Mr. Riddle. How are you going to help yourself? Summarize your best pretext evidence. Mr. Riddle went to my client and said, Well, I've decided you don't have the qualifications, and thus you're not going to get the job. That's not what happened. It's for a jury to decide. In the EEOC statement, which defendants are now saying, well, it really doesn't mean that we made mistakes, it is said Riddle personally visited Huggins' office and explained to her that they needed a person with broader and deeper experience than she offered. She seemed to accept this explanation and did not protest. And when I put Mr. Riddle under oath and asked him that very question, he didn't say I went there and gave her all this information. He admitted that he went into her office and said, I'm looking for someone else outside the organization, and turned around and walked out. Now, if that doesn't create for a jury a determination that there is ambiguity here, and, Your Honor, you have used the word ambiguity. Ambiguity is for a jury to decide. My time is up. I thank you very much for your participation. Thank you both for your arguments in this matter. It will stand submitted.
judges: Lucero, Callahan, Bade